## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| WENSTON DESUE, individually and as legal guardian of N.D. and M.D. and all others similarly situated, <br><br>     **Plaintiffs,** <br><br> **v.** <br><br> 20/20 EYE CARE NETWORK, INC., A Florida Corporation, <br><br> **and** <br><br> ICARE HEALTH SOLUTIONS, LLC., A Florida Limited Liability Company <br><br><br>     **Defendants.** | **CASE NO.:** <br><br> <u>**CLASS ACTION**</u> <br><br> **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

       Plaintiff Wenston DeSue, individually and as legal guardian of minor children whose initials are M.D. and N.D. (collectively "Plaintiffs"), individually and on behalf of all other similarly situated individuals, and by and through undersigned counsel, files this Class Action Complaint against 20/20 Eye Care Network, Inc. ("20/20") and iCare Health Solutions, Inc. ("iCare"), (collectively, "Defendants"), and alleges the following based upon personal knowledge of facts pertaining to Plaintiffs and upon information and belief based upon the investigation of counsel as to all other matters.

### INTRODUCTION

       1.     Plaintiffs bring this class action to hold Defendants accountable for the harm they caused to Plaintiffs and over 3.2 million similarly situated persons (including minors), from their failure to properly secure and safeguard sensitive and private health and personally identifiable

information (including, without limitation, Social Security numbers, member identification numbers, dates of birth, and health insurance information names) ("PII/PHI").

2.      Defendant 20/20 is an entity providing eye and hearing care services and administration, including on behalf of various entities.

3.      Upon information and belief, Defendant iCare partially owns and is partnered with 20/20 to provide integrated eye and hearing health and administrative services through Florida.

4.      In June 2021, Plaintiffs received letters dated May 28, 2021, similar to the letter submitted to the Office of the Maine Attorney General.  See Exhibit A.  The letters stated that in January 2021, PII/PHI that was on 20/20's systems had been illegally exposed to unknown person(s). The notifications revealed that unauthorized person(s) accessed 20/20's system and deleted files. *Id*. The breach occurred because Defendants failed to implement adequate and reasonable cyber-security procedures and protocols to protect patient PII/PHI; indeed, the deficiencies in Defendants' data security protocols and practices were so significant that unknown person(s) were able to access, view and even delete patient data. ("Data Breach").

5.      Defendants disregarded the rights of Plaintiffs and putative Class Members (defined below) by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected; failing to disclose to its patients the material fact that it did not have adequate computer systems and security practices to safeguard their PII/PHI; failing to take available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

6.      As a result of Defendants' failure to implement and follow basic security procedures, Plaintiffs' and Class Members' PII/PHI was accessed and taken control of by thieves. As a result, Plaintiffs and Class Members face a substantial increased risk of identity theft, and Plaintiffs and Class Members have had to and will continue to significant time and money to protect themselves due to Defendants' failures. And unfortunately, as a result of Defendants' conduct and the ensuing Data Breach, Plaintiffs and Class Members, including minors, will be at a heightened risk of identity theft and fraud for the remainder of their lives.

CLASS ACTION COMPLAINT

7.      Thus, Plaintiffs seek, among other things, orders requiring Defendants to fully and accurately disclose the nature of the information that has been compromised and to adopt reasonably sufficient security practices and safeguards to prevent incidents like the Data Breach from occurring in the future.

8.      On behalf of all others similarly situated, Plaintiffs allege claims for negligence, invasion of privacy, breach of implied contract, unjust enrichment, breach of fiduciary duty, breach of confidence and violation of Florida's Deceptive and Unfair Trade Practices Act (Florida Statute § 501.203, *et seq*.).

## PARTIES

9.      Plaintiff Weston DeSue is an individual who resides in Bradenton, Florida. He receives services from 20/20 Eye Care Network, Inc. On or about June 18, 2021, he received notice that an unauthorized person had accessed 20/20 Eye Network, Inc.'s system and accessed and deleted patient PII/PHI.

10.     Plaintiff Weston DeSue is the legal guardian of Plaintiffs M.D. and N.D., minor patients of 20/20, and who reside in Bradenton, Florida. On or about June, they received notice dated May 28, 2021, that their PII/PHI on a 20/20 system, along with other patients' PII/PHI, had been improperly exposed to unknown person(s) on January 11, 2021.

11.     Defendant 20/20 Eye Care Network, Inc. is a managed vision care company that offers third party administrative services. It contracts with optometrists, ophthalmologists, ambulatory surgical centers, and retail vision centers to provide a full spectrum of eye care needs. Its management services include claims processing, credentialing, management utilization, and network leasing.

12.     Defendant 20/20 owns 20/20 Hearing Care Network, Inc. 20/20 Hearing Care Network is a health care provider specializing in audiology services and related administration tasks.

13.     Defendant iCare Health Solutions, LLC is an integrated specialty network and administrator of comprehensive ocular care services. It contracts with health plans and

multispecialty clinics to deliver comprehensive ocular health solutions through a network of optometrists and ophthalmologists.

14.     Upon information and belief, in September 2020, Defendant iCare, backed by private equity firm Pine Tree Equity IV, LP, invested in Defendant 20/20 and, in whole or in part, controls Defendant 20/20 in providing integrated eye care as both Florida's largest managed service provider as well as the largest ophthalmology and optometry provider with over 55 owned locations.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are in excess of 100 putative class members, at least some of whom have a different citizenship from Defendants.[1]

16.     This Court has jurisdiction over Defendant 20/20 Eye Care Network, Inc. because its principal place of business is located in this District at 2900 W. Cypress Creek Road, Suite 4, Fort Lauderdale, Florida 33309.

17.     This Court has jurisdiction over Defendant iCare Health Solutions, LLC because its principal place of business is located in this District at 7352 NW 34 Street Miami, Florida 33122.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. On information and belief, Plaintiffs' PII/PHI was transmitted to and by Defendants and input into 20/20's network within the District. 20/20 is based in this District, likely maintains patient PII/PHI in the District, and has caused harm to Plaintiffs and Class Members emanating from this District.

## STATEMENT OF FACTS

19.     Plaintiffs M.D. and N.D. received medical services from 20/20 Hearing Care Network, Inc.

---

[1] While Defendants serve Floridians, persons outside Florida were impacted, including 221 residents of Maine. https://apps.web.maine.gov/online/aeviewer/ME/40/946029d6-7945-4a23-89c1-0ea29e9c18a2.shtml (last accessed June 16, 2021).

20.     Plaintiff DeSue received medical services from 20/20 Eye Care Network, Inc.

21.     Defendant iCare's Chief Compliance Offer reported to the Maine Attorney General that nearly 3.3 million individuals were impacted by the Data Breach,[2] ranking it among the largest health care data breaches reported. It reported that it discovered the Data Breach on February 18, 2021 and described it as "insider wrongdoing."[3]

22.     On May 28, 2021, Defendants sent a letter to the parents or guardians of minors N.D. and M.D. that was signed by 20/20 Hearing Care Network, Inc. *See* Exhibit A. The notification letter explained "20/20 Hearing Care Network, Inc. helps manage your child's hearing benefits" and was executed by 20/20 Hearing Care Network, Inc.

23.     On May 28, 2021, Defendants sent a breach notice letter to Plaintiff Wenston Desue. The letter was executed by 20/20 Eye Care Network, Inc.

24.     The letters stated that unauthorized third-party unknown actor(s) accessed patient information. The information was contained in an Amazon Web Services cloud storage bucket and was accessed or downloaded, then deleted, by unknown actor(s).

25.     The notification explained the Data Breach, in relevant part by setting forth:

*What happened?*  We realized an unknown person(s) accessed our system and deleted some files on 1/11/21. We do not think there is any actual misuse of your child's personal or vision/hearing insurance information, but we don't know for sure. A cybersecurity firm looked into the incident for us and could not tell which files were seen or deleted by the unknown person(s). Thus, we looked at all the information on the system that could have been seen or deleted to see if you child's information was involved.
*What information was involved?* Your Social Security number, member identification number, date of birth and health insurance information may have been seen or accessed before being detected. This information is called your personal information or protected health information (PHI). It tells others about you and is part of your identity.[4]

---

[2] https://apps.web.maine.gov/online/aeviewer/ME/40/946029d6-7945-4a23-89c1-0ea29e9c18a2.shtml (last accessed June 16, 2021).

[3] *Id.*

[4] Exhibit A. The letter sent to Office of Maine Attorney General. Plaintiffs' notices contain substantially the same language.

A.  *Value of Personally Identifiable Information*

26.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[5] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[6] The FTC acknowledges that identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[7]

27.    PHI is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[8] As a result of large-scale data breaches, identity thieves and cyber criminals have openly posted stolen Social Security numbers, healthcare information, and other PHI directly on various Internet websites making the information publicly available. These networks and markets consist of hundreds of thousands, if not millions, of nefarious actors who view and access the PHI.

28.    Professionals tasked with trying to stop fraud and other misuse know that PHI has real monetary value in part because criminals continue their efforts to obtain this data.[9] According to the Identity Theft Resource Center, 2017 saw 1,579 data breaches, representing a 44.7 percent

---

[5] 17 C.F.R § 248.201 (2013).

[6] *Id.*

[7]    *Guide for Assisting Identity Theft Victims*, FTC (Sep. 2013), *available at*: https://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (the "FTC Guide")(last visited April 21, 2019).

[8]    FTC Guide, *supra* n.9.

[9] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *CIO Magazine*, https://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html (last visited January 23, 2019).

CLASS ACTION COMPLAINT

increase over the record high figures reported a year earlier.[10] The Healthcare sector had the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.[11]

29.     Healthcare related data is among the most sensitive and personally consequential when compromised. A report focusing on health-care breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000."[12] Further, a majority of the victims were forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage. Moreover, almost 50 percent of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.[13]

30.     PHI is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[14] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

---

[10] *2017 Annual Data Breach Year-End Review, available at*: https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf (last visited June 21, 2021).

[11] Identity Theft Resource Center, 2018 End -of-Year Data Breach Report, *available at*: https://www.idtheftcenter.org/2018-end-of-year-data-breach-report/ (last visited June 21, 2021).

[12] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited June 21, 2021).

[13]   *Id.*

[14] Federal Trade Commission, *Warning Signs of Identity Theft, available at:* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed Apr. 19, 2021).

CLASS ACTION COMPLAINT

31.    While credit card information and associated personally identifiable information can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[15]

32.    Protected health information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

33.    Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[16]

34.    The ramifications of Defendants' failure to keep Plaintiffs' and Class Members' PHI secure are long lasting and severe. Once PHI is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

35.    Further, criminals often trade stolen PHI on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PHI on the internet, thereby making such information publicly available.

---

[15] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Apr. 19, 2021).

[16] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at:* https://khn.org/news/rise-of-indentity-theft/ (last accessed Apr. 18, 2021).

36.     Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened. [17] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[18]

37.     Here, not only was sensitive medical information compromised, but also patient Social Security numbers. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.[19] This time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used, compounds an identity theft victim's ability to detect and address the harm.

38.     Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

39.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security Number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[17] *See* Medical ID Theft Checklist, *available at:*   https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last accessed Apr. 18, 2021).

[18] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accessed Apr. 19, 2021).

[19] *Identity Theft and Your Social Security Number*, Social Security Administrative *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf.

CLASS ACTION COMPLAINT

40.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

41.     Defendants knew the importance of safeguarding patient PII/PHI entrusted to it and of the foreseeable consequences that would occur if its data security systems were breached, including the significant costs that would be imposed on their patients as a result of a breach.

42.     Defendants' offer of free credit monitoring is inadequate in that it will not protect the minors and is otherwise insufficient to mitigate the damage caused by the data breach.

43.     According to Robert P. Chappell, Jr., a law enforcement professional, a minor's information can be stolen and used until the minor turns eighteen years old before the minor even realizes he or she has been victimized.[21]

44.     The risk to M.D. and N.D. is substantial given their age and lack of established credit because their information can be used to create a "clean identity slate." It is not surprising then that one report found that children are 51% more likely be victims of identity theft than adults.[22] Cybercriminals on the Dark Web have been caught selling Social Security number of infants for just $300 per number to be used on fraudulent tax returns.[23]

**B.  _Defendants Acquire, Collect, and Maintain Plaintiffs' and Class Members' PII/PHI_**

45.     Defendants acquire, collect, and maintain a massive amount of protected health information and other personally identifiable data on patients.

---

[20] Bryan Naylor, _Victims of Social Security Number Theft Find It's Hard to Bounce Back_, NPR (Feb. 9, 2015), _available at_ http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Apr. 21, 2021).

[21] https://www.parents.com/kids/safety/tips/what-is-child-identity-theft/ (last accessed on May 20, 2021).

[22] https://axiomcyber.com/data-breach/how-data-breaches-affect-children/ (last accessed on June 18, 2021).

[23] _Id._

---

CLASS ACTION COMPLAINT

46.     As a condition of receiving health care, Defendants require that their customers entrust them with highly sensitive personal information. In the ordinary course of business, they will collect and maintain this information including using it to process claims submitted by patient providers. Insurers contract with 20/20 to provide an allegedly more efficient process by which patient claims may be processed.

47.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and the Class Members' PII/PHI, Defendants assumed legal and equitable duties to those individuals and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PHI from disclosure.

48.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI. Plaintiff and the Class Members, as current and former patients, relied on the Defendants to keep their PII/PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### C. *Defendants' Privacy Policies*

49.     iCare informs patients that they have certain rights about their PHI and how it can be disclosed. Nowhere does iCare inform patients that their PHI may be disclosed to unauthorized persons.[24]

### D. *The Healthcare Sector is Particularly Susceptible to Data Breaches*

50.     Defendants were on notice that companies in the healthcare industry are susceptible targets for data breaches.

51.     Defendants were also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for

---

[24] https://www.myicarehealth.com/privacy-policy (last visited June 18, 2021).

the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[25]

52.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.

53.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[26] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[27] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[28]

---

[25] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at*: https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last accessed Apr. 19, 2021).

[26] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Apr. 19, 2021).

[27] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Apr. 19, 2021).

[28] *Id.*

CLASS ACTION COMPLAINT

54.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[29] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[30]

55.     As the number of healthcare data breaches continues to rise, email remains the primary outlet through which health data is exposed. For example, in 2017, there were 85 reported email-related healthcare breaches—more than double the number reported in 2016—accounting for nearly one-quarter of all healthcare breaches.[31]

*56.*     As major healthcare providers, Defendants knew, or should have known, the importance of safeguarding the patients' PHI entrusted to it and of the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on Defendants' customers as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[29] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himss-cybersecurity-survey (last accessed Apr. 19, 2021).

[30] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed Apr. 19, 2021).

[31] Jessica Kim Cohen, *Email Is Now the Top Source of Healthcare Breaches*, Modern Healthcare (Mar. 23, 2019), *available at*: https://www.modernhealthcare.com/technology/email-now-top-source-healthcare-breaches (last accessed Apr. 19, 2021).

CLASS ACTION COMPLAINT

E.  _Defendants' Conduct Violates HIPAA and Industry Standard Practices_

57.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

58.     The Data Breach resulted from a combination of insufficiencies that indicate Defendants failed to comply with safeguards mandated by HIPAA regulations and industry standards. The security failures include, but are not limited to:

a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to adequately catalog the location of patients/customers', including Plaintiffs' and Class Members', digital information;

d.  Failing to properly encrypt Plaintiffs' and Class Members' PHI;

e.  Failing to ensure the confidentiality and integrity of electronic protected health information Defendants create, receive, maintain, and transmit in violation of 45 CFR 164.306(a)(1);

f.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

g.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

h.  Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii);

i.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2);

j.  Failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3);

k.  Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 CFR 164.306(a)(94);

l.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq.*;

m.   Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 CFR 164.530(b) and 45 CFR 164.308(a)(5); and

n.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 CFR 164.530(c).

### F.  *Plaintiffs and Class Members Suffered Damages*

59.   The ramifications of Defendants' failure to keep patients' PII/PHI secure are long lasting and severe.  Once PII/PHI is stolen, fraudulent use of that information and damage to victims may continue for years.

60.   The PII/PHI belonging to Plaintiffs and Class Members is private and sensitive in nature and was left inadequately protected by Defendants who did not obtain Plaintiffs' or Class Members' consent to disclose their PII/PHI to any other person as required by applicable law and industry standards.

61.   The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII/PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII/PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

62.   Defendants had the resources necessary to prevent a breach but neglected to adequately invest in data security.

63.   Had Defendants remedied the deficiencies in data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusion and, ultimately, the theft of PHI.

CLASS ACTION COMPLAINT

64.     As a direct and proximate result of Defendants' wrongful actions and inaction, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[32]

65.     To date, 20/20 has only offered patients advice on how to sign up for free credit monitoring services. Exhibit A.  This is wholly inadequate. As discussed above, victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft. Moreover, Defendant's offer does not address any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII/PHI, including medical information.

66.     Furthermore, Defendant's providing information on how to sign up for free credit monitoring squarely places the burden on Plaintiffs and Class Members, rather than Defendants, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the Data Breach, Defendant merely sent instructions "offering" the services to affected patients/customers recommending they sign up for the services.

67.     As a result of the Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

   a.   The compromise, publication, theft and/or unauthorized use of their PII/PHI;

   b.   Unauthorized use and misuse of their PII/PHI;

   c.   The loss of the opportunity to control how their PII/PHI is used;

---

[32] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 *available at:* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited June 21, 2021).

CLASS ACTION COMPLAINT

d.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

e.  Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.  The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII/PHI being placed in the hands of criminals;

g.  The continued risk to their PII/PHI that is subject to further breaches so long as Defendants fails to undertake appropriate measures to protect the PII/PHI in 20/20's possession; and

h.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

68.     In addition to a remedy for the economic harm, Plaintiffs and the Class maintain an undeniable interest in ensuring that their PII/PHI is secure, remains secure, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a Nationwide class defined as follows:

All persons whose Social Security number, member identification number, date of birth, and/or health insurance information in 20/20 Eye Care Network Inc.'s network was exposed to unauthorized third parties on or about January 11, 2021. ("Nationwide Class")

70.     Plaintiffs also seeks certification of a Florida sub-class defined as follows:

All persons who reside in the State of Florida whose Social Security number, member identification number, date of birth, and/or health insurance information in 20/20 Eye Care

Network Inc.'s network was exposed to unauthorized third parties on or about January 11, 2021. ("Florida Class")

71.     The Nationwide Class and Florida Class are collectively referred to as "Class" and "Class Members." Excluded from the Class are Defendants and any of their affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

72.      Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

73.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

74.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of patients affected in the Data Breach is unknown, upon information and belief, it is in excess of three million, and therefore meets the numerosity requirement of 23(a)(1).

75.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.  Whether Defendants had a duty to protect patient PII/PHI;

b.  Whether Defendants knew or should have known of the susceptibility of 20/20 systems to a data breach;

c.  Whether security measures to protect their systems were reasonable in light of FTC data security recommendations and best practices recommended by data security experts;

d.  Whether Defendants were negligent in failing to implement or require implementation of reasonable and adequate security procedures and practices;

  e. Whether Defendants' failure to implement or require implementation of adequate data security measures allowed the Data Breach to occur;

  f. Whether Defendants' conduct, including failures to act, resulted in or were the proximate cause of the Data Breach, resulting in the unlawful exposure of the Plaintiffs' and Class Members' PII/PHI;

  g. Whether Plaintiffs and Class Members were injured and suffered damages or other losses because of Defendants' failures; and,

  h. Whether Plaintiffs and Class Members are entitled to relief.

76. **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members.  Plaintiffs' PII/PHI was exposed in the Data Breach. Plaintiffs' damages and injuries are akin to other Class Members, and Plaintiffs seek relief consistent with the relief sought by the Class.

77. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class they seek to represent; are committed to pursuing this matter against Defendant to obtain relief for the Class; and have no conflicts of interest with the Class. Moreover, Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

78. **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct is impracticable. Individual litigation by each Class Member would also strain the court system. Moreover, individual litigation creates the

potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

79.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct or failure to act, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

80.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

> a.  Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII/PHI;
>
> b.  Whether Defendants' security measures to protect data systems were reasonable in light of FTC data security recommendations, and other best practices recommended by data security experts;
>
> c.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;
>
> d.  Whether Defendants failed to take commercially reasonable steps to safeguard patient PII/PHI; and
>
> e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

81.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to patient names and addresses affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(ON BEHALF OF ALL CLASSES)**

82.     Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

83.     As a condition of receiving services, Plaintiffs and Class Members were obligated to provide 20/20 with their PII/PHI.

84.     Plaintiffs and the Class Members entrusted their PII/PHI to Defendants with the understanding that they would safeguard the information.

85.     Defendants had full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and Class Members could and would suffer if the PII/PHI were wrongfully disclosed.

86.     Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining and testing security protocols to ensure that Plaintiffs' and Class Members' information in Defendants' possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of patient information.

87.     Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing PII/PHI, the critical importance of providing adequate security of PII/PHI, the current cyber scams being perpetrated on PII/PHI, and that it had inadequate protocols, including security protocols in place to secure the PII/PHI of Plaintiffs and the Class.

88.     Defendants' own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' misconduct included their failure to take the steps and opportunities to prevent the Data Breach and their failure to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII/PHI of Plaintiffs and Class Members.

89.     Plaintiffs and the Class Members have no ability to protect their PII/PHI that was in 20/20's possession.

90.     Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

91.     Defendants had a duty to have proper procedures in place to prevent the unauthorized dissemination of Plaintiffs' and Class Members' PII/PHI.

92.     Defendants have admitted that Plaintiffs' and Class Members' PII/PHI was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

93.     Defendants, through actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' PII/PHI while it was within the 20/20's possession or control.

94.     Defendants improperly and inadequately safeguarded Plaintiffs' and Class Members' PII/PHI in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

95.      Defendants, through actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its patients' PII/PHI.

96.     Defendants, through actions and/or omissions, unlawfully breached their duty to adequately disclose to Plaintiffs and Class Members the existence, and scope of the Data Breach.

97.     But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiffs' and Class Members' PII/PHI would not have been compromised.

98.     There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the PII/PHI of current and former patients and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class.

99.     As a result of  Defendant's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity

theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

**SECOND CAUSE OF ACTION**
**INVASION OF PRIVACY**
**(ON BEHALF OF ALL CLASSES)**

100.     Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

101.     Plaintiffs and Class Members had a legitimate expectation of privacy with regard to their PII/PHI and were entitled to the protection of this information against disclosure to unauthorized third parties.

102.     Defendants owed a duty to patients in their network, including Plaintiffs and Class Members, to keep their PII/PHI contained as a part thereof, confidential.

103.     Defendants failed to protect patient PII/PHI by allowing unauthorized parties access 20/20's network and thereby gain unfettered access to Plaintiffs' and Class Members' PII/PHI.

104.     The unauthorized release of PII/PHI, especially the type related to personal health information, is highly offensive to a reasonable person.

105.     The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their PII/PHI to Defendants as part of their use of Defendants' services, but privately with an intention that the PII/PHI would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

106.     The Data Breach at the hands of Defendants constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

107.    Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they were with actual knowledge that their information security practices were inadequate and insufficient.

108.    Because Defendants acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members.

109.    As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class Members' PII/PHI was disclosed to and used by third parties without authorization, causing Plaintiffs and Class Members to suffer damages.

110.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the PII/PHI collected by Defendants can be viewed, distributed, and used by unauthorized persons. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class.

## THIRD CAUSE OF ACTION

### BREACH OF IMPLIED CONTRACT
### (ON BEHALF OF ALL CLASSES)

111.    Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

112.    Plaintiffs and Class Members were required to provide their PII/PHI, including names, addresses, dates of birth and various health related information to Defendants as a condition of their use of Defendants' services.

113.    Plaintiffs and Class Members paid money to Defendants directly or indirectly in exchange for services and had a reasonable expectation that Defendants would protect their PII/PHI from unauthorized disclosure.

114.    Implicit in the agreement between the Defendants' patients, including Plaintiffs and Class Members, to provide protected PII/PHI, and Defendants' acceptance of such protected health

information and other PII/PHI, was Defendants' obligation to use the PII/PHI of their patients for business purposes only, take reasonable steps to secure and safeguard the PII/PHI, and not make unauthorized disclosures of the PII/PHI to unauthorized third parties.

115.    Further, implicit in the agreement, Defendants were obligated to provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII/PHI.

116.    Without such implied contracts, Plaintiffs and Class Members would not have provided their PII/PHI to Defendants.

117.    Defendants had an implied duty to reasonably safeguard and protect the PII/PHI of Plaintiffs and Class Members from unauthorized disclosure or uses.

118.    Additionally, Defendants implicitly promised to retain PII/PHI only under conditions that kept such information secure and confidential.

119.    Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendants, however, Defendants did not.

120.    Defendants breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PII/PHI, which was compromised as a result of the Data Breach.

121.    Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to comply with HIPAA.

122.    Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information Defendants created, received, maintained, and transmitted in violation of 45 CFR 164.306(a)(1).

123.    Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1).

124.    Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1).

125.    Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii).

126.    Finally, Defendants also breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2).

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF ALL CLASSES)

127.    Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

128.    Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased goods and services from Defendants and in so doing provided Defendants with their PII/PHI. In exchange, Plaintiffs and Class Members were entitled to have Defendant protect their PII/PHI with adequate data security.

129.    Defendants knew that and Class Members conferred a benefit on Defendants and accepted and have accepted or retained that benefit. Defendants profited from these transactions and used the PII/PHI of Plaintiffs and Class Members for business purposes.

130.    The amounts Plaintiffs and Class Members paid for goods and services were used, in part, to pay for use of 20/20's network and the administrative costs of data management and security.

131.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

132.     Defendants failed to secure Plaintiffs' and Class Members' PII/PHI and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

133.     Defendants acquired the PII/PHI through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

134.     If Plaintiffs and Class Members knew that Defendants would not secure its PII/PHI using adequate security measures, they would not have engaged in transactions with Defendants.

135.     Plaintiffs and Class Members have no adequate remedy at law.

136.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants' fail to undertake appropriate and adequate measures to protect the PII/PHI of patients and in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (viii) the diminished value of Defendants' services they received.

137.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

138.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(ON BEHALF OF ALL CLASSES)**

139.     Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

140.     In light of the special relationship between Defendants and their patients, whereby Defendants became guardians of Plaintiffs' and Class Members' highly sensitive, confidential, personal, financial information, and other PII/PHI, Defendants became a fiduciary created by their undertaking and guardianship of the PII/PHI, to act primarily for the benefit of their patients, including Plaintiffs and Class Members, for: 1) the safeguarding of Plaintiffs and Class Members' PII/PHI; 2) adequately notifying Plaintiffs and Class Members' of a data breach or disclosure; and 3) maintaining complete and accurate records of what and where Defendant's patients' information was and is stored and/or deleted.

141.     Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its patients' relationship, in particular to keep secure the PII/PHI of its patients.

142.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the systems containing Plaintiffs' and Class Members' PII/PHI.

143.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to timely and adequately notify and/or warn Plaintiffs and Class Members of the Data Breach.

144.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information they created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

145.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain

electronic PII/PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1).

146.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

147.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii).

148.    Defendant breached fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2).

149.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3).

150.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 CFR 164.306(a)(94).

151.    Defendants breached fiduciary duties to Plaintiffs and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, et seq.

152.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PHI in violation of 45 CFR 164.530(b) and 45 CFR 164.308(a)(5).

153.    Defendants breached fiduciary duties to Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 CFR 164.530(c).

154.    Defendants breached fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

155.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII/PHI of customers/patients and former customers/patients in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (viii) the diminished value of Defendants' services they received.

156.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## SIXTH CAUSE OF ACTION
## BREACH OF CONFIDENCE
## (ON BEHALF OF ALL CLASSES)

157.     Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

158.     At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII/PHI that Plaintiffs and Class Members provided.

159.     As alleged herein and above, Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII/PHI would be collected, stored, and protected in confidence, and would not be disclosed the unauthorized persons.

160.     Plaintiffs and Class Members provided their respective PII/PHI with the explicit and implicit understandings that Defendants would protect and not permit the PII/PHI to be disseminated to any unauthorized parties.

161.     Plaintiffs and Class Members also provided their respective PII/PHI with the explicit and implicit understandings that Defendants would take precautions to protect that PII/PHI from unauthorized disclosure, such as following basic principles of encryption and information security practices.

162.     Defendants voluntarily received in confidence Plaintiffs' and Class Members' PII/PHI with the understanding it would not be disclosed or disseminated to the public or any unauthorized third parties.

163.     Due to Defendants' failure to prevent, detect, avoid the Data Breach from occurring by, *inter alia*, following best information security practices to secure Plaintiffs' and Class Members' PII/PHI, Plaintiffs' and Class Members' PII/PHI was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

CLASS ACTION COMPLAINT

164.     As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiffs and Class Members have suffered damages.

165.     But for Defendant's disclosure of Plaintiffs' and Class Members' PII/PHI in violation of the parties' understanding of confidence, their PII/PHI would not have been compromised, stolen, viewed, accessed, deleted, and used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII/PHI, as well as the resulting damages.

166.     The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI. Defendants knew or should have known 20/20 computer systems and technologies for accepting and securing Plaintiffs' and Class Members' PII/PHI had numerous security vulnerabilities because Defendants failed to observe even basic security practices necessary to prevent fraudulent provider accounts from being created.

167.     As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII/PHI of customers/patients and former customers/patients in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of

CLASS ACTION COMPLAINT

Plaintiffs and Class Members; and (viii) the diminished value of Defendants' goods and services they received.

168.     As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. §§ 501.201,** *et seq.*
**(ON BEHALF OF ALL CLASSES)**

169.     Plaintiffs restate and reallege paragraphs 1 through 68 above as if fully set forth herein.

170.     Plaintiffs and Class Members are patients for whom 20/20 helped manage hearing benefits. Plaintiffs and Class Members purchased or otherwise availed themselves of health insurance benefits primarily for personal, family, or household purposes.

171.     Defendants engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement of health-related services on behalf of Plaintiffs and Class Members.

172.     Defendants engaged in, and its acts and omissions affect, trade and commerce. Defendants' acts, practices, and omissions were done in the course of Defendants' business of marketing, offering to sell, and selling health services throughout the United States.

173.     Defendants, operating in Florida, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

   a.   failure to maintain adequate computer systems and data security practices to safeguard patient-customer PII/PHI;

   b.   failure to disclose that their computer systems and data security practices were inadequate to safeguard patient-customer PII/PHI from theft;

    c.   failure to timely and accurately disclose the Data Breach to Plaintiffs and Class Members;

    d.   continued acceptance and storage of patient PII/PHI after Defendants knew or should have known of the security vulnerabilities that were exploited in the Data Breach; and,

    e.   continued acceptance and storage of patient PII/PHI after Defendants knew or should have known of the Data Breach and before it allegedly remediated the Data Breach.

174.   These unfair acts and practices violated duties imposed by laws, including by not limited to the FTCA and Fla. Stat. § 501.171(2).

175.   As a direct and proximate result of Defendants' violations of the Florida Unfair and Deceptive Trade Practices Act, Plaintiffs and Class Members suffered damages including, but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by closely reviewing and monitoring their medical transactions for unauthorized activity, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

176.   Also, as a direct result of Defendants' knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiffs and Class Members are entitled to damages as well as injunctive relief, including, but not limited to:

    a.   Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on 20/20's systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

CLASS ACTION COMPLAINT

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train security personnel regarding any new or modified procedures;

d. Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

e. Ordering that Defendants purge, delete, and destroy patient PII/PHI not necessary for its provisions of services in a reasonably secure manner;

f. Ordering that Defendants conduct regular database scans and security checks;

g. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h. Ordering Defendants to meaningfully educate patients about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps patients should take to protect themselves.

177.    Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow patient-consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Defendants' wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

178.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to patient-consumers or to competition.

179.    Defendants knew or should have known that the 20/20 computer systems and data security practices were inadequate to safeguard Class Members' PII/PHI and that the risk of a data breach or theft was high.

180.    Defendants' actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

181.    Plaintiffs and Class Members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to, damages, restitution, injunctive relief, and/or attorney fees and costs, and any other just and proper relief.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the following relief:

a.  An Order certifying this case as a class action;

b.  An Order appointing Plaintiffs as the Class Representatives;

c.  An Order appointing undersigned counsel as Class Counsel;

d.  A mandatory injunction directing the Defendants to hereinafter adequately safeguard the Class' PII/PHI by implementing improved security procedures and measures;

e.  An award of damages;

f.  An award of costs and expenses;

g.  An award of attorneys' fees; and

h.  Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues triable by a jury.

.

Dated: June 21, 2021

/s/ Ryan J. McGee
Ryan J. McGee, Florida Bar No. 64957
rmcgee@forthepeople.com
Francesca Kester, Florida Bar No. 1021991
fkester@forthepeople.com
**MORGAN & MORGAN**

**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505

Gayle M. Blatt (PHV to be submitted)
*gmb@cglaw.com*
**CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811

Attorneys for Plaintiffs and the Putative Classes